CAPITAL NATIONAL BANK OF TAMPA, Plaintiff-Appellee, Cross-Appellant,

v.

J. A. HUTCHINSON, Jr., Defendant-Appellant, Cross-Appellee.

No. 29232.

United States Court of Appeals, Fifth Circuit.

Dec. 1, 1970.

Rehearing Denied Dec. 22, 1970.

Robert E. Knox, Thompson, Ga., A. Rowland Dye, Douglas D. Batchelor, Jr., Augusta, Ga., for appellant; Hull, Towill, Norman, Barrett & Johnson, Augusta, Ga., of counsel.

Gwinn H. Nixon, Augusta, Ga., James B. McDonough, Jr., Tampa, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and · DYER and INGRAHAM, Circuit Judges.

DYER, Circuit Judge:

In this controversy involving fraud, shoddy business. practices and misplaced trust, Hutchinson asks this Court to reverse a judgment notwithstanding the verdict in favor of Capital National Bank of Tampa, Florida. The District Court held Hutchinson liable as the sole remaining solvent endorser on five notes, totalling $40,000. On appeal, Hutchinson contends that the debt for which the notes were collateral had been discharged, thereby releasing him from liability. Capital cross-appeals, claiming that the jury verdict for Hutchinson on a sixth note, in the amount of $10,000, should be reversed; the Bank asks that judgment in its favor be rendered or that its motion for a new trial be granted. We reverse the judgment notwithstanding the verdict and affirm the jury verdict in favor of Hutchinson.

This legal labyrinth is the result of both parties' mental somnolescence. In January, 1964, Hutchinson sold a motel located in Greenville, North Carolina, to Pitt Motel Corporation, a wholly owned subsidiary of Intercontinental Motels, Ltd. As part of the purchase price, he accepted six notes, four in the amount of $10,000 and two in the amount of $5,000. The notes were endorsed by Intercontinental and also by Martin Von Zamft and William Fanning, both prin-

cipals in the former. Upon receiving the notes, Hutchinson endorsed five, totalling $40,000, and returned them to Fanning. Hutchinson did so with the understanding that the notes would be discounted and the proceeds sent to him according to a payment schedule.

Fanning, however, had other uses for the notes endorsed by Hutchinson. On February 19, 1964, he and Von Zamft took the notes to Capital National Bank, which made a good faith loan to Intercontinental in the amount of $40,000. Capital kept the five notes as collateral to secure the loan and gave the proceeds to Intercontinental.

On March 2, 1964, Hutchinson spoke with Theodore Davis, then president of Capital, by telephone. Hutchinson allegedly did not know, and Davis did not inform him, that Capital held the five notes which he had endorsed as collateral for the $40,000 loan to Intercontinental. After the telephone conversation, Hutchinson endorsed the sixth note for $10,000 and mailed it to Davis with instructions that Capital send him the proceeds resulting from the discount. Instead, on March 13, 1964, Capital lent Intercontinental an additional $10,000; "on advice of counsel," the Bank used the sixth note sent by Hutchinson as collateral for the new loan. In any event, Hutchinson never received the $10,000.

On September 29, 1964, Capital learned that Pitt and Intercontinental were subject to Chapter X bankruptcy proceedings. When it became apparent that the loans to Intercontinental were sour, a vice-president of Capital wrote Davis, who had left Capital to become president of a bank in Miami, Florida, and advised him of the condition of the loans. Davis then contacted Von Zamft and Fanning to complain about the weakness of the loans. Von Zamft offered to strengthen the loans with the name of Gordon S. Miller, if Capital would loan Miller additional money. Upon Davis's recommendation Capital loaned Miller $90,000 on an open, unsecured note dated December 10, 1964.

The money was deposited in Miller's account with the Bank. Simultaneously, and as part of the understanding, Capital transferred $50,316.67 from Miller's account and entered a payment of $50,000 plus accrued interest on Intercontinental's liability ledger. The bookkeeping entries show payment in full of the Intercontinental indebtedness.

Although Capital did not stipulate that the notes endorsed by Hutchinson would serve as collateral for the Miller note, it retained physical possession of them. Likewise, it did not physically surrender or cancel the Intercontinental notes. Capital's witnesses testified that the bookkeeping entries were merely pro forma: they denied any intention to cancel the Intercontinental notes or release the collateral.

As the District Court noted, in lending $90,000 to Miller, Capital threw good money after bad. Like Pitt and Intercontinental, Miller pocketed the proceeds of the loan and soon claimed bankruptcy. Apparently Capital and Hutchinson are the only solvent parties remaining after this commercial debacle.

Hutchinson and his attorney during the Pitt Motel sale, testified that between January 1964 and July 1964, when Pitt and Intercontinental became the subjects of bankruptcy proceedings, they made numerous attempts to ascertain why the five notes totalling $40,000 had not been discounted and the proceeds returned to Hutchinson. Although he traveled to Miami for conferences with Fanning and Von Zamft at least twice, Hutchinson allegedly did not realize until September 28, 1964, that Capital held these notes as collateral for the $40,000 Intercontinental note.

Following the trial the District Court submitted written interrogatories to the jury. The questions and answers were:

1. Under all the facts and circumstances, was there any implied agreement by the Capital National Bank of Tampa that the acceptance of the $90,000 note on December 10, 1964 from Gordon S. Miller and the alloca-

tions of the credit derived from that note constituted payment and discharge of the notes from Intercontinental Motels, Ltd.? Yes.

2. If the answer to the first question is yes, did the Capital National Bank of Tampa at that time retain the six (6) notes of Pitt Motel Corporation, endorsed by J. A. Hutchinson, Jr., as collateral for the payment of the $90,000 note of Gordon S. Miller to the Bank? No.

3. Did the Capital National Bank of Tampa act in bad faith when it accepted in February 1964 the five (5) notes in the amount of $40,000 endorsed by J. A. Hutchinson, Jr., and gave the money to Intercontinental Motels, Ltd.? No.

4. Did the Capital National Bank of Tampa act in bad faith when it accepted in March 1964 the $10,000.00 note endorsed by J. A. Hutchinson, Jr., and gave the money to Intercontinental Motels, Ltd.? Yes.

5. Did the Capital National Bank of Tampa fail to furnish a valuable consideration (which does not have to be money) to J. A. Hutchinson, Jr., for the $10,000.00 note of Pitt Motel Corporation endorsed by J. A. Hutchinson, Jr., and mailed to the Bank by Hutchinson in March, 1964? Yes.

6. Was the delivery of the $10,000.00 Pitt Motel note to Capital National Bank by Defendant Hutchinson on March 2, 1964 a part of the same transaction under which Capital National Bank earlier received $40,000.00 of Pitt Motel notes? No.

The court then entered a verdict for the defendant J. A. Hutchinson, Jr. Later, however, the District Judge granted a judgment notwithstanding the verdict in the amount of $40,000 in favor of Capital National Bank. He reasoned that the loan to Miller, the accompanying book entries, and the nature and effect of the transaction show nothing more than a substitution of debtors. The trial judge held that, as a matter of law, when a creditor substitutes one debtor for another by accepting the latter's promissory note in satisfaction of the former's, when the creditor retains physical possession of the collateral surrendered by the original debtor who does not object to such retention, and when there is no ostensible consideration running to the new obligor from the creditor or from the original debtor, then the presumption that the collateral was intended by all parties to the substitution to secure the new note becomes conclusive.

As to the sixth note of $10,000, the judge concluded that the jury finding of bad faith on the part of Capital was amply supported by the evidence. Therefore, he affirmed the jury verdict for Hutchinson.

Appealing from the judgment notwithstanding the verdict, Hutchinson argues that the District Court's "conclusive presumption" rests on a chimerical premise. Specifically, he contends that the Capital-Miller loan transaction constituted a novation. According to Hutchinson a substitution of debtors by novation is essentially an agreement. Its terms are governed by the intention of the parties, a factual issue for the jury, not a legal question for the Court. Consequently the conclusive presumption of law as to collateral for the Capital-Miller loan was erroneous. The jury verdict should not have been disturbed, since there was no agreement that the security for the $40,000 Capital-Intercontinental loan should survive payment of that loan.

 In this diversity action, Capital and Hutchinson agree that Florida law controls. Under Florida law a novation is a mutual agreement between the parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the same or another debtor. Novation results not from the mere substitution of one writing for another, but only from the substitution of a new obligation for another—with intent to extinguish the old. Fontainbleau Hotel

Corp. v. Crossman, 5 Cir. 1963, 323 F.2d 937, 942; Murphy v. Green, 102 Fla. 102, 135 So. 531, 534 (1931). Necessarily incident to any novation is the extinction of the prior contractual obligation. Fontainbleau Hotel Corp. v. Crossman, *supra*; Burge v. Maund, 66 Fla. 173, 63 So. 708 (1913).

In Murphy v. Green, *supra,* the leading Florida case with regard to novation, the Florida Supreme Court commented:

> If there is an express agreement by the creditor to receive a note as absolute payment, and to run the risk of its being paid, it will be held to be an extinguishment or payment of the precedent debt, whether the note is afterwards paid or not, but a clear agreement or manifestation of intention of both parties to that effect is essential. * * *

> While novation may take place only by agreement, depending upon the intention of the parties at the time of making it, it therefore becomes largely a matter of proof and not of law. * * * Where a new executory promise itself is the thing accepted in consideration of the discharge of a former one, it will be operative accordingly, and the fact that the former contract has not been performed will not destroy or alter the effect of the novation nor operate to revive or restore the extinguished obligation.

135 So. at 534. Express agreement becomes unnecessary when the parties clearly manifest an intention to effect a novation. Assent to, and acceptance of, the terms of a novation may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct. Orlando Orange Groves Co. v. Hale, 119 Fla. 159, 161 So. 284, 291 (1935). Thus, whether a novation exists in any situation depends on factual allegations and proof, not on legal conclusions. Hargadine-McKittrick Dry Goods Co. v. Goodman, 55 Fla. 361, 45 So. 995, 997 (1908); *see* Travis v. Central Surety & Insurance Corp., 5 Cir. 1941, 117 F.2d 595, 596.

Since Capital cancelled the Intercontinental notes after receipt of the Miller note, a novation allegedly occurred. However, the Bank continued to hold the Hutchinson-endorsed notes which had provided security for the Intercontinental loans. To justify retention of these notes, Capital argues that its cancellation of the Intercontinental debt was merely conditional, that Hutchinson could not be discharged as an endorser until the Miller note was paid. Therefore, it never intended to effect a novation. Second, the Bank urges that, even if a novation occurred, Miller became the equitable assignee of the Hutchinson collateral.

Capital's first contention is its most serious, for Florida law with regard to the acceptance of a promissory note in satisfaction of an antecedent debt is nebulous. On the one hand, Florida courts have held that novation, which extinguishes the old debt, may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct. Orlando Orange Groves Co. v. Hale, *supra; see* Fontainbleau Hotel Corp. v. Crossman, *supra.* On the other hand, these same courts have stated that Florida law requires an express agreement that the giving of a promissory note or negotiable instrument shall operate as payment before it can have that effect. Seaver v. Stratton, 133 Fla. 183, 183 So. 335, 337 (1937); Wishart v. Gates Rubber Co. Sales Div., Inc., 163 So.2d 503, 506. (Fla.Dist.Ct.App.), cert. denied, 169 So. 2d 386 (Fla.1964); accord, Commercial Credit Corp. v. Sorgel, 5 Cir. 1960, 274 F.2d 449, 458, cert. denied, 364 U.S. 834, 81 S.Ct. 48, 5 L.Ed.2d 59; Holcombe v. Solinger & Sons Co., 5 Cir. 1956, 238 F.2d 495, 500. Moreover, the mere fact that a receipt or ledger contains the words "paid in full," or similar phraseology, does not render parol evidence inadmissible with respect to it. Phillips v. Frost, 147 So.2d 568, 569 (Fla.Dist.Ct.App. 1962).

However, in King v. Mc-Connell, 57 Fla. 77, 49 So. 539 (1909), the Florida Supreme Court indicated: "Giving a note for an existing debt is not a payment of the debt, unless the note is received under an express agreement that it is a payment, or *under circumstances from which an agreement may be fairly inferred to regard the note as payment,* or unless payment is in fact made." [Emphasis added]. In novation situations, extinguishment of the original debt is an essential requisite of novation, not a result. Mills v. McMillan, 78 Fla. 294, 82 So. 812, 814 (1919); *see* Burge v. Maund, *supra.* Since novation may be implied from facts and circumstances, it follows that extinction of the original debt, a requisite of novation, may be implied, even in promissory note situations. Otherwise, Florida law with regard to novations would be self-contradictory when promissory notes are involved. Morever, the rule of King v. McConnell, *supra,* would become a nullity. No Florida court has yet made this assertion.

Indeed, those decisions enunciating the "express agreement" concept have done so in factual contexts easily distinguishable from that presented here. *See, e.g.,* Seaver v. Stratton, *supra*; Wishart v. Gates Rubber Co. Sales Div., Inc., *supra.* Furthermore, they have demonstrated that an express agreement need not be bounded by the four corners of any document. Ultimately the question whether there has been an express agreement that a promissory note is to be considered as payment for an antecedent debt is one of fact for the jury. *See, e.g.,* Seaver v. Stratton, *supra*; Wishart v. Gates Rubber Co. Sales Div., Inc., *supra.* As the Florida Supreme Court stated in Frank v. Williams, 36 Fla. 136, 18 So. 351, 356 (1895), a landmark case in this area,

[i]t is true, as a general rule, that the mere acceptance by a creditor from his debtor of a promissory note for a pre-existing contract debt does not, in the absence of an agreement to that effect, extinguish the original demand. May v. Gamble, 14 Fla. 467; Salomon v. [Pioneer] Cooperative Co., 21 Fla. 374. In such case no recovery can be had on the original cause of action unless the note is produced to be canceled, or, in case of its loss, the establishment of such fact. Whether a note taken for an antecedent simple contract debt be in settlement and satisfaction thereof is a question of intent, it seems, to be determined as other facts of a case.

Only when the intention and purpose of the taking of the promissory note appears conclusively to have been for the purpose of further securing an antecedent obligation will there remain no factual issue as to intent for the jury. *See* Hargadine-McKittrick Dry Goods Co. v. Goodman, *supra*; Wishart v. Gates Rubber Co. Sales Div., Inc., *supra.*

Clearly the perimeter of the "express agreement" requirement is capacious in Florida. In fact, it may be said that, realistically, no dichotomy between the general rule with regard to novation and that with respect to payment by promissory note exists. In either situation one must consider the facts and circumstances—verbal, as well as other types of evidence—before making a determination. In such a field, as ploughed by the state courts, extinction of an obligation by implication and payment of an antecedent debt by promissory note often seems interchangeable; any distinction between the problems involved in the two types of transactions becomes merely semantic. Either situation necessitates a factual determination by a jury. Legal decisions by the court are tolerable only in the clearest cases, where no genuine factual issue remains.

The present controversy is well suited for the jury consideration mandated under Florida law. When Capital began to worry about the Intercontinental loans, it turned to Davis, who, as president of

Capital, had negotiated them. Davis contacted Fanning and Von Zamft; they agreed to assist in strengthening the Intercontinental notes. Their efforts produced Miller, whose financial credentials were allegedly impeccable. In return for a loan of $90,000, Miller would satisfy the Intercontinental debt by payment.

■ Undoubtedly Capital deemed the Miller transaction an escape from potential loss as a result of Intercontinental's default. In light of Intercontinental's serious financial problems, the strongest Intercontinental note might well have been *no* Intercontinental note. On the one hand, the evidence would have supported a jury finding either that the Bank did not contemplate the legal likelihood that an unsecured loan to Miller would mean loss of the Hutchinson collateral and did not adequately protect itself, or that the Bank's officers agreed to discharge Intercontinental's debt and to sacrifice the Hutchinson collateral in return for a solvent obligor. However, on the other hand, there was evidence to support a jury finding that Capital did not intend to extinguish the Intercontinental debt or to release the Hutchinson collateral. Certainly the facts involved in, and the implications resulting from, the Capital-Miller transaction were in dispute; they not only merited but compelled jury consideration.

When the jury considered the questions arising out of the dealings among Capital, Intercontinental, and Miller, it found that Miller paid and discharged the Intercontinental note. Furthermore, the jury determined that Capital did not retain the Hutchinson-endorsed notes as collateral for the Miller loan. Under Florida law the jury's decision should have ended the matter. Consequently the District Judge erred when he refused to accept the jury's answer to the second interrogatory and granted a judgment notwithstanding the verdict for Capital. Conclusive presumptions, such as articulated by the District Judge

to buttress his judgment, "do not establish a rule of evidence, *but declare a rule of substantive law."* United States v. Jones, 9 Cir. 1949, 176 F.2d 278, 288; *see* Commissioner of Internal Revenue v. Clark, 7 Cir. 1953, 202 F.2d 94, 99–100. Manifestly, in the factual context of this case, there could have been no conclusive presumption as to the existence of a novation or as to Capital's retention of the Hutchinson collateral. Therefore, the jury verdict in favor of Hutchinson should not have been disturbed.

■ Capital's second contention— even if the jury verdict regarding the existence of a novation is sustained, Miller became the equitable assignee of the Hutchinson notes by paying the Intercontinental debt—must also fail. Essentially the Bank urges that, upon payment, Miller was subrogated to Capital's rights against Intercontinental, including the right to collect the Hutchinson collateral.

In Boley v. Daniel, 72 Fla. 121, 72 So. 644, 645 (1916), the court commented:

Subrogation is the substitution of one person in the place of another with reference to a lawful claim or right. Subrogation arises by operation of law, where one having a liability or a right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is, in equity, entitled to the security or obligation held by the creditor whom he has paid. This is called "legal subrogation." Conventional subrogation depends upon a lawful contract, and occurs where one having no interest in or relation to the matter pays the debt of another, and by agreement is entitled to the securities and rights of the creditor so paid.

Florida courts have not departed from the benchmark definition promulgated in Boley. *See, e.g.,* Allstate Life Insurance Co. v. Weldon, 213 So.2d 15, 18 (Fla. Dist.Ct.App.1968); De Cespedes v. Prudence Mutual Casualty Co., 193 So.2d

224, 227 (Fla.Dist.Ct.App.1966), aff'd, 202 So.2d 561 (Fla.1967).

Here there can be no legal subrogation, for Capital produced no evidence that Miller had any interest in the Hutchinson notes which served as collateral for the Intercontinental debt. *See, e.g.,* Fowler v. Lee, 106 Fla. 712, 143 So. 613, 614 (1932); Furlong v. Leybourne, 138 So.2d 352, 356 (Fla.Dist.Ct.App. 1962).[1] Nor did the Bank submit any evidence that Miller was under an obligation to pay the Intercontinental debt.

Likewise, there can be no conventional subrogation, for Capital did not offer any agreement entitling Miller to the original creditor's rights and securities. In fact, the current president of Capital testified that the Bank had no arrangement with Miller to assign to him, or collect for him, the Hutchinson notes. There is no evidence of an agreement between Hutchinson and Miller concerning these notes.

Even assuming *arguendo* that Miller became subrogated to the Bank's interest in the collateral, Capital does not explain how it regained the rights which it allegedly surrendered. Without proof to the contrary, the Bank's right to collect the Hutchinson notes terminated as soon as the novation occurred. Capital may not now claim that mere possession of the notes entitled it to utilize them when Miller defaulted.

Finally, Capital's cross-appeal with regard to the sixth Hutchinson note must fail. As the District Judge noted, there was ample evidence to support the jury's findings and conclusions. *See* Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374–376.

Affirmed in part and reversed in part.

---

[1] In Furlong v. Leybourne, *supra,* a Florida court remarked that "the right to be subrogated to the rights and securities of the creditor extends to anyone paying any part of the debt of another provided the entire debt is paid." *Id.* at 356. In an accompanying footnote, however, the court qualified this declaration: "The foregoing principle of law assumes that the one paying is not a volunteer and has sufficient interest to warrant the payments of another's debt." *Id.* at n. 4.